**SIGNED THIS: June 20, 2008**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TY J. GREER and MICHELLE R. GREER, | ) | No. 07-82720 |
| | ) | |
| Debtors. | ) | |

**O P I N I O N**

The issue in this case is simply stated: Is a debtor's postpetition job loss grounds for a reduction in the amount of the monthly payment needed to confirm a Chapter 13 plan over the trustee's objection? This Court answers that question in the negative. While the passage of BAPCPA has left bankruptcy courts awash in ambiguity, Congressional intent on this issue is readily discernable from the broad and explicit change effected through the newly defined term "current monthly income" (sometimes referred to as CMI).

When they filed their Chapter 13 petition on December 4, 2007, the Debtors, Ty J. Greer and Michelle R. Greer (individually "TY" and "MICHELLE", collectively the "DEBTORS"), were both employed. They disclosed on Schedule I that MICHELLE earned

monthly gross wages of $2,200 and had net monthly take home pay of $1,694.22. Pursuant to the Part II calculation on Official Form 22C, based on their average monthly income during the 6 months before filing, the DEBTORS are "over-median" so that their applicable commitment period is 5 years.[1] Line 58 of Form 22C showed Monthly Disposable Income of $1,189.02. However, the DEBTORS claimed an "Other Expense" on Line 59 for additional rent of $859.00. The Other Expense deduction reduced the Monthly Disposable Income to $330.02. The Chapter 13 Plan filed by the DEBTORS called for monthly payments of $410.00 for 60 months. The Chapter 13 Trustee (TRUSTEE) objected to confirmation on the basis that the plan failed to provide that all of the DEBTORS' projected disposable income was to be paid to unsecured creditors, in violation of Section 1325(b)(1)(B), alleging that the Other Expense deduction for additional rent was improper.

Subsequent to filing, MICHELLE lost her job. On January 23, 2008, the DEBTORS filed Amended Schedule I deleting all income attributable to her former employment, and an Amended Plan reducing their plan payments to $100.00 per month for 60 months. They also filed an Amended and then a Second Amended Form 22C that made various expense deduction modifications, but which still included MICHELLE'S prepetition wages as originally disclosed. Line 58 on the Second Amended Form 22C shows Monthly Disposable Income as $2,027.87 with the previously asserted Other Expense deduction for additional rent now deleted.

The TRUSTEE takes the position that Section 1325(b)(1)(B) operates to prevent confirmation unless the DEBTORS pay unsecured creditors $121,672.20 (60 x $2,027.87) or

---

[1] That the DEBTORS are over-median is of no consequence to the issue at bar, as "current monthly income" defines "disposable income" for all Chapter 13 debtors, applicable whenever the trustee or an unsecured creditor objects to confirmation. The under and over-median distinction is relevant only for purposes of determining allowable expense deductions. 11 U.S.C. § 1325(b).

2

100% of their claims, without regard to MICHELLE'S postpetition reduction in income. The DEBTORS argue that the Court can and must take the job loss into account for purposes of confirmation and should confirm the Amended Plan because $100 per month is now all that the DEBTORS can afford to pay.

The issue revolves around the interpretation of two provisions of the Code. Section 1325(b) provides in pertinent part as follows:

> (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–
> * * *
> (B) the plan provides that all of the debtor's *projected disposable income* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.
>
> (2) For purposes of this subsection, the term "disposable income" means *current monthly income* received by the debtor . . . less amounts reasonably necessary to be expended . . . . (Emphasis added).

11 U.S.C. § 1325(b). The term "current monthly income" is a defined term that means the average monthly income from all sources that the debtor received during the 6 months before filing. 11 U.S.C. § 101(10A).

With respect to their position that MICHELLE'S postpetition loss of income must be taken into account, the DEBTORS concede that "current monthly income" and, thus, "disposable income" are backward-looking terms that rely on purely historical data. They argue that the modifier "projected" as used in the phrase "projected disposable income" in Section 1325(b)(1)(B) signals courts to add a forward-looking element to the analysis by taking into account postpetition changes to income. They contend that determining plan

3

payments based on income no longer received is an absurd result. The DEBTORS emphasize that they are not asking the Court to disregard Official Form 22C, only that Schedules I and J provide a "more accurate" formula for determining the projected disposable income in this case.

For his part, the TRUSTEE urges the Court to adopt the "plain meaning" or "mechanical" approach followed by a number of courts, including the 8th Circuit Bankruptcy Appellate Panel in *In re Frederickson,* 375 B.R. 829 (8th Cir.BAP 2007). The TRUSTEE urges rejection of those opinions that hold that a court must consider an over-median debtor's current, not just historical, income when determining projected disposable income, such as in *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006).

In this Court's view, the strongest argument in favor of the TRUSTEE'S position is simply that BAPCPA dramatically changed the methodology for calculating a debtor's disposable income. Although the logic may be fuzzy and the statutory language less than crystal clear, there can be no doubt that Congress intended to do away with the old way of determining disposable income and the required amount of the monthly Chapter 13 plan payments. While it is easy to be sympathetic to the idea that the old way was better and should be preserved, Congress made a policy decision to go in a different direction.

Before BAPCPA, the concept for CMI as a 6-month historical average did not exist. Upon objection to confirmation, Chapter 13 debtors were required to pay all of their "projected disposable income" for at least three years into the plan. That amount was typically calculated by reference to Schedule I - Current Income of Individual Debtor(s) and Schedule J - Current Expenditures of Individual Debtor(s). *Frederickson,* 375 B.R. at 832-33.

The Official Form of Schedule I contemplated that anticipated postpetition changes would be taken into account, directing the debtor to "Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document." Unanticipated changes, such as job loss or change in employment, that occurred after filing but before confirmation, were also ordinarily taken into account by courts that considered it their role to use the best available information to make the most accurate prediction possible of the debtor's post-confirmation disposable income.[2]

The pre-BAPCPA methodology for determining disposable income permitted the use of the most current information that enabled courts to predict with as much certainty as possible the correct payment amount "as of the effective date of the plan," as required by Section 1325(b)(1). As described in COLLIER'S, where no postpetition changes occurred or were anticipated, a purely mathematical calculation was used to project the debtor's disposable income over the term of the plan:

> First, the court must project the debtor's income over the next three years. To some extent this task is, of course, impossible. The court has no way of knowing whether debtors will continue to work at their current incomes, or whether they will be laid off or become disabled or suffer other diminutions of income. The court does not know whether the debtor will live for three years. In cases of debtors engaged in business, this task is even more problematic. As a practical matter, unless there are changes which can be clearly foreseen, the court must simply multiply the debtor's current monthly income by thirty-six.

5 COLLIER ON BANKRUPTCY ¶ 1325.08[4][a], Rel. 55-8/95 (15th ed.).

Admittedly, it is not clear why Congress viewed the prior system as a problem in need of a solution. Perhaps there was a perception that debtors were gaming the system

---

[2] Whether or not testimony and documents were admitted at a contested hearing, or simply presented by affidavit or stipulation, the question of a Chapter 13 debtor's projected disposable income was one of fact subject to judicial determination based upon an evidentiary record.

by filing for relief when they were between jobs, at a time when their current income was far lower than their historical income and lower than their future income was likely to be. Congress apparently believed that a 6-month historical average of a debtor's income is a better, more reliable predictor of future income over three to five years, than a snapshot of the debtor's current income on the petition date. Whatever the rationale, BAPCPA moved away from a system that relied on the court making a factual determination based upon all available evidence, to one that defines disposable income by reference to historical data, thereby eliminating any need for the court to attempt to predict the debtor's future income.

Use of the new CMI standard has caused courts to suffer cognitive dissonance. In the sound exercise of their discretion and good judgment, and in an effort to make the most accurate prediction of a debtor's future income as possible, courts have traditionally had the latitude to ignore obsolete historical information and to use a debtor's current income and anticipated changes as the best predictor of the future. Where a debtor's employment has permanently changed, for example, there is no logical reason to factor in what he formerly earned, whether more or less than his current income. The new CMI structure now forces courts to rely upon historical income, even if no longer seen as probative because of changed circumstances. This rearview mirror approach is often perceived as counterintuitive.

One judicial response to this dilemma has been to construe a debtor's CMI as a mere starting point or a rebuttable presumption. *In re Pak,* 378 B.R. 257 (9th Cir.BAP 2007); *In re Kibbe,* 361 B.R. 302 (1st Cir.BAP 2007); *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006). These courts continue to permit the debtor to offer evidence that his income, as of the effective

6

date of the plan, is or will be substantially lower than reflected in the 6-month historical average. They also permit the trustee or a creditor to present evidence of a higher expected income. The BAP in *Pak* opined that "[i]t makes no sense to interpret 'projected disposable income,' governing debtors' future payments under their chapter 13 plans, as cast in stone by their pre-bankruptcy history, without any opportunity for the trustee, creditors *or the debtor* to offer rebutting evidence as to changed income circumstances before the effective date of the plan." *Pak,* 378 B.R. at 267. Struggling to inject a forward-looking aspect to the analysis, the courts that take this view usually cite the need to give meaning to the term "projected" or the phrase "as of the effective date of the plan." *See In re Hanks,* 362 B.R. 494, 498-501 (Bankr.D.Utah 2007) (collecting cases).

The difficulty with preserving the ability to use current information is that it eviscerates the purpose and effect of the historical average. Notwithstanding the seemingly moderate terms "starting point" and "rebuttable presumption," Section 1325(b)(2) does not contemplate any blending or averaging of CMI with actual or anticipated income and does not reflect an intent that CMI should be applied as a presumption. *In re Kagenveama,* --- F.3d ----, 2008 WL 2278681 (9th Cir. 2008). Any attempt to preserve the discretion to factor in current income data would result in an annulment of the new CMI standard. To retain judicial discretion is to disregard the definition of CMI. Why this is so is best explained by District Judge Barbara Crabb in *In re Mancl,* 381 B.R. 537 (W.D.Wis. 2008), as follows:

> Before the BAPCPA amendments took effect, calculating disposable income involved a flexible and value judgment-laden inquiry into the propriety of Schedules I and J. In contrast, the bright line test of the

7

amended § 1325(b) is a purely mechanical endeavor admitting of no discretion. Section 1325(b)(2) says that "disposable income" means current monthly income "for purposes of this subsection." The term disposable income is used only once in the subsection, in the phrase "projected disposable income." To adopt the majority view, one must assume that Congress created the precise and objective current monthly income definition of § 101(10A), mandated that bankruptcy courts apply it to the § 1325(b) test, and then added the term "projected" to empower bankruptcy courts to ignore the § 101(10A) definition, substituting their own sense of fairness by applying the former process of analyzing and comparing schedules I and J. Given the precision and detail of the statute, such an interpretation is untenable.

Moreover, requiring strict adherence to the statute is entirely consistent with congressional objectives in changing the law. Replacing the previous nuanced and discretionary computation of disposable income with the uncompromising six-month average income determination deprived bankruptcy courts of discretion and made a certain number of harsh results inevitable for both debtors and creditors. It also enhanced consistency and predictability and limited the opportunities for manipulation of the process. There is no reason to believe that Congress did not anticipate and intend both of these effects. To the contrary, it is very likely that Congress anticipated the precise circumstances of this case, in which a pre-petition decline in income precipitates a bankruptcy filing, leaving debtors in a position of having to pay less than under the former regime. Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way*, 13 Am. Bankr.Inst. L.Rev. 665, 682 (2005) (citing legislative history that Chapter 13 trustees informed Congress that BAPCPA would have the effect of reducing required payments for some high income debtors). Although it is understandable that bankruptcy courts might resist strict adherence to the code's new requirements in favor of retaining their former discretionary powers, it is apparent from the language and history of the BAPCPA that adherence to objectively defined standards and reduced judicial discretion is what Congress intended.

The clear meaning and intent of § 1325(b) is to establish objective and defined methods for calculating both income and expenses to be used in setting minimum payments to unsecured Chapter 13 creditors. One consequence of the enhanced certainty of the new statutory scheme is that some debtors' actual income and expenses vary from the standard. That consequence is entirely predictable (in fact, inevitable) and is certainly not a justification for ignoring the detailed parameters of § 1325(b).

*In re Mancl*, 381 B.R. at 541-42.

While it is true that the word "projected" and the phrase "as of the effective date of the plan" remain in place in Section 1325(b)(1) and may still be construed as forward-looking indicators, these terms predate BAPCPA. Courts that attempt to interpret Section 1325(b) as a harmonious whole and give that meaning to those terms overlook the fact that Congress was not writing on a blank slate when it enacted BAPCPA. Rather than rewrite Section 1325(b)(1) in its entirety, Congress chose to implement the new methodology by creating a new definition for the critical term "disposable income," incorporating that definition by reference into the prior provision, and otherwise leaving that provision substantially unchanged. The obvious intent of the amendment is to change, not preserve, the way that disposable income is calculated.

To the extent that the term "projected" and the phrase "as of the effective date of the plan" may still be given forward-looking meanings that are inconsistent with the now historical-focused definition of "disposable income," that inconsistency is best explained as a result of the fact that Congress did not rewrite Section 1325(b)(1) to perfectly harmonize the new definition with the old law. As is obvious from many provisions of BAPCPA, the amendment process did not include a concerted effort by the drafters to seamlessly integrate the new with the old or to ferret out every semantical inconsistency and ambiguity. But the presence of an inconsistent term should not be used as a license to ignore the effect of amendatory legislation.[3]

---

[3]The primary function of statutory construction is to effectuate the intent of Congress. *F.T.C. v. Anheuser-Busch, Inc.* 363 U.S. 536, 553, 80 S.Ct. 1267, 1276, 4 L.Ed.2d 1385 (1960). Canons of construction are mere aids to that process and should not be used to displace the search for statutory meaning. *Interstate Natural Gas Ass'n of America v. F.E.R.C.*, 716 F.2d 1, 10 (D.C.Cir. 1983). Some courts have used the canon against surplusage as a basis for giving a continued forward-looking effect to the term "projected." Because that rationale flies in the face of the clear rejection by BAPCPA of the old methodology, it will not be followed here.

As stated in *Mancl,* it is inconceivable that Congress created the new term CMI and redefined "disposable income" by reference to it, but left the modifier "projected" in place so as to enable courts to ignore the CMI calculation whenever they didn't like the result. Full effect must be given to the drastic change implemented through the new CMI concept rather than allowing it to be nullified by attributing an overriding contrary intent to a preexisting modifier.

Moreover, the ambiguity in the term "projected" is avoidable. In the context of Section 1325(b)(1)(B), "projected" has been given two competing meanings. First, projected disposable income is simply an amount calculated by multiplying a debtor's disposable income (determined by the equation set forth in Section 1325(b)(2)) by the number of months in the applicable commitment period (60 for over-median debtors). This definition is a mathematical calculation that does not require the exercise of judgment to predict what the debtor is likely to earn in the future. *Kagenveama, supra.* Second, the act of projecting a debtor's disposable income forward over the term of the plan requires a predictive judgment, based upon current evidence or data. *In re Hardacre,* 338 B.R. 718 (Bankr.N.D. Tex. 2006). The first definition creates no conflict with the historical-based CMI. The second alternative creates a direct conflict with the term CMI. The non-conflicting interpretation is preferred. *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 544 (7th Cir. 2003) (statutory provisions to be construed so as to avoid conflicts between them, if possible and reasonable). *See, also, Hanks,* 362 B.R. at 499 ("projected" should not be elevated in importance so as to gut the new statutory scheme).

Neither does the fact that MICHELLE lost her job after filing for bankruptcy relief change the equation. A debtor's CMI is determined by the 6-month period preceding the filing. Post-filing changes to income are simply not relevant to that calculation and may not be considered for plan confirmation purposes. *In re Ellringer,* 370 B.R. 905, 910 (Bankr.D.Minn. 2007) (as snapshot of debtor's finances, means test not meant to be continually updated as debtor's circumstances change).

Finally, giving CMI its plain text meaning does not lead to absurd results. Where no substantial changes have occurred, the 6-month average is a reasonable predictor of future income. Where recent changes have occurred or are anticipated, the timing of the filing becomes an important consideration. Where unanticipated adverse changes to income occur post-filing, dismissal and refiling is an option. These possibilities were likely known to Congress before passage of BAPCPA and cannot be said to be absurd. *See, Kagenveama,* at * 4-5; *Mancl,* 381 B.R. at 541-42.

For these reasons, the Court determines that the Amended Plan proposing payment of $100.00 per month is not confirmable over the TRUSTEE'S objection. In order to obtain confirmation, the DEBTORS must propose in their plan to pay unsecured creditors $121,672.20 (60 months x $2,027.87) or 100% of their claims. This result follows from the operation of Section 1325(b)(1)(B) and is not affected by MICHELLE'S postpetition job loss. Confirmation of the Amended Plan will be denied, and the DEBTORS will be given 14 days to file a Second Amended Plan.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###